1 **WO**

2
3
4
5
6         IN THE UNITED STATES DISTRICT COURT
7              FOR THE DISTRICT OF ARIZONA
8

9  Roger Hansen, et al.,              )   No. CV-10-8224-PHX-GMS
                                      )
10              Plaintiffs,            )   **ORDER**
                                      )
11  vs.                                )
                                      )
12                                     )
    United States Department of Agriculture,)
13  et al.,                            )
                                      )
14              Defendants.            )
                                      )
15  _____  )

16

Pending before the Court are cross-motions for Summary Judgment by Plaintiffs Roger Hansen, Connie Hansen, Logan Hansen, and Jeanette Hansen (Doc. 19) and Defendants the United States Department of Agriculture ("USDA") and Secretary of Agriculture Thomas Vilsack. (Doc. 20). For the reasons detailed below, Plaintiffs' motion is denied and Defendants' motion is granted.

**BACKGROUND**

On December 30, 1996, Plaintiff Hansen applied for an easement for the Porter Springs Ditch with the United States Department of Agriculture's Forest Service ("Forest Service"). (AR, Ex. 2 at 00021-00037).[1] The application was submitted pursuant to the Act

---

[1] The 109-exhibit Administrative Record has been docketed in thirty parts as docket numbers 14, 15, and 16. For the purposes of this Order, the exhibits will be referenced by their exhibit numbers in the Administrative Record ("AR").

of October 27, 1986, Pub. L. No. 99-545, 100 Stat. 3047, commonly called the "Colorado Ditch Bill," amending the Federal Land Policy and Management Act of 1976, codified at 43 U.S.C. § 1761 (2006). The Ditch Bill provides that the Secretary of Agriculture shall issue permanent easements for water systems constructed and in operation prior to October 21,1976 that traverse National Forest System lands so long as the following seven conditions are met:

> (A) the traversed National Forest lands are in a State where the appropriation doctrine governs the ownership of water rights;
>
> (B) at the time of submission of the application the water system is used solely for agricultural irrigation or livestock watering purposes;
>
> (C) the use served by the water system is not located solely on Federal lands;
>
> (D) the originally constructed facilities comprising such system have been in substantially continuous operation without abandonment;
>
> (E) the applicant has a valid existing right, established under applicable State law, for water to be conveyed by the water system;
>
> (F) a recordable survey and other information concerning the location and characteristics of the system as necessary for proper management of National Forest lands is provided to the Secretary of Agriculture by the applicant for the easement; and
>
> (G) the applicant submits such application on or before December 31, 1996.

43 U.S.C. § 1761(c)(1).

Pursuant to Hansen's application for an easement, the Forest Service conducted a survey of the Porter Springs Ditch on April 29, 2008, documenting the survey with notes and photographs. (AR, Exs. 27–30, 63). During the Summer of 2008, a National Forest Service hydrologist analyzed a series of aerial photographs of the ditch. (AR, Exs. 58, 62). On November 12, 2008, the Forest Service denied Hansen's application, concluding based upon their survey and analysis that "the lower portion of the ditch has not been maintained or used for many years and water is not conveyed to private lands." (AR, Ex. 35). Hansen filed an appeal to the Regional Forester on December 10, 2008. (AR, Ex. 36). On February 6, 2009, the Appeal Reviewing Officer notified Hansen that he was not an eligible applicant under the relevant Federal Regulations, and that his appeal was therefore dismissed without a decision

1  on the merits. (AR, Ex. 40; *see* 36 C.F.R §§ 251.81, § 251.92(a)(1)). The letter noted that the
2  Chief's office "may at their discretion review this dismissal." (AR, Ex. 40; *see* 36 C.F.R. §
3  251.87(d)). On February 24, 2009, the Acting Director for Ecosystem Management
4  Coordination for the USDA notified Hansen that it was electing not to exercise discretionary
5  review of the decision, and stated that the letter "constitutes the final administrative action of
6  the United States Department of Agriculture." (AR, Ex. 41).

7        On May 28, 2009, Hansen wrote to the Forest Supervisor and the District Ranger for
8  the Forest Service regarding the denial. (AR, Ex. 43). In the letter, he challenges the findings
9  of the survey, alleging both that the ditch filled a tank on private land and that the ditch had
10 been used every year. In the letter, he states that members of the Forest Service "falsified the
11 report." (*Id.* at 00186). Hansen sent pictures of the ditch to the Forest Service in June of 2009,
12 and Forest Service personnel returned to the ditch and took further photographs in July of
13 2009. (AR, Exs. 45–46, 57, 63). The photographs documented that extensive maintenance had
14 been done on the ditch after the application had been denied, as Hansen acknowledges. (Doc.
15 23 ¶ 19 ("The maintenance was quite substantial because for the last 10 years maintenance
16 had been conducted only with a hand shovel")). During internal communications in early
17 2010, members of the Forest Service discussed Hansen's application. During these
18 conversations, one member of the Forest Service opined that while the Forest Service's
19 conclusion that the ditch had been abandoned was "a perfectly reasonable observation" based
20 upon the survey, Hansen and others had informed him that "the ditch as been used for many
21 decades and never been unused for 5 or more years." (AR, Ex. 70). Another wrote that Hansen
22 had "acknowledged the ditch wasn't much of a structure at the point it reached private land,
23 but said it got the job done." (AR, Ex. 71). This employee wrote that in his opinion, since the
24 ditch had filled the tank on private land, even if it "let overland flow do the majority of the
25 work," Hansen qualified for an easement under the Act. (*Id.*).

26       In response to these concerns, the Forest Service re-evaluated the water flow from the
27 ditch and the tanks on private land and concluded that the tank was not in fact being filled by
28 Porter Springs Ditch. (AR, Ex. 75 at 000310-11 ("[W]e did not see evidence of use connected

to the Porter Springs Ditch on the private parcel in Section 26")). A member of the Forest Service met with Hansen for 2½ hours on June 11, 2010 to explain the decision, and during the meeting Hansen was "very direct in his dialogue, accusations, and challenges." (AR, Ex. 78). Hansen met with the Forest Supervisor responsible for his case on June 15, 2010, and wrote a letter which he described as "an addendum to my appeal." (AR, Ex. 82). On July 26, the Forest Supervisor wrote Hansen to inform him that "no further administrative consideration or recognition will be given to your ditchbill application and/or any further appeals you may wish to make." (AR, Ex. 84).

On August 16, 2010, Hansen appealed the decision to the Department of Agriculture under 36 C.F.R. § 215, which authorizes appeals of "[d]ecisions for projects and activities implementing land and resource management plans documented in a Record of Decision (ROD) or Decision Notice (DN), including those which contain a non-significant amendment to a land and resource management plan as a part of the decision." 36 C.F.R. 215.11(a). Since the denial of his easement was not such a decision, his appeal was denied. (AR, Ex. 92). On October 13, 2010, the Director of Lands and Realty Management wrote Plaintiff to inform him that "the Forest Service considers this matter closed and will no longer address any questions regarding the agency evaluation of your Ditch Bill application," noting that "[i]f you wish to pursue this further, you will have to bring an appropriate action in the United States District Court." (AR, Ex. 109).

On November 18, 2010, Plaintiffs brought this action, alleging that the decision to deny the application was "without foundation, was arbitrary and capricious, and unlawful." (Doc. 1 ¶ 10). Defendants submitted the Administrative Record on February 18, 2011 (Docs. 14–16). Plaintiffs filed a motion for summary judgment on April 12, and Defendants filed a Response and Cross-Motion on June 3, 2011.[2]

---

[2] Plaintiffs have failed to abide by the Local Rules in their filings, which lack captions, are single spaced, and are generally formatted as letters rather than legal briefs. (Docs. 19, 23). Since Plaintiffs are proceeding *pro se*, however, the Court has ignored these errors and construed the pleadings liberally. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law

- 4 -

**DISCUSSION**

**1.     Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When a suit challenges an adjudication made by a federal agency, summary judgment is governed by the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (2006). A court reviewing an agency's decision bases its analysis on "[w]hether on the record as a whole there is substantial evidence to support agency findings." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 491 (1951). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it," the court should remand the case to the agency for further action. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

A Court can only reverse an agency's decision if, after evaluating the record on the whole, it finds that action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing under the arbitrary and capricious standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm*, 463 U.S. 29, 42–43 (1983). Although the standard is therefore narrow, the Court is required to "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). After conducting the review, the Court must uphold the agency's action so long as there is a "rational connection between the facts found and the conclusions made." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004).

---

that the allegations of [a pro se plaintiff's] complaint, 'however inartfully pleaded' are held 'to less stringent standards than formal pleadings drafted by lawyers.'").

**2.      Analysis**

The Forest Service denied the application for a Ditch Bill based upon its finding that the use served by the water system was not located solely on Federal lands and that the system was not in substantially continuous operation without abandonment. (AR, Ex. 35). It so found based upon a field survey of the property conducted by GPS and extensive analysis of aerial photography of the site. (AR, Exs. 27–30, 58, 62–63). The observation notes from the two Forest Service officials who conducted the survey are informative:

> It does not appear as if diverted waters flow much past (approx. 0.25 mile) the Dipping Coral [*sic*] Tank. This observation is based on the lack of indication of flow *within* the ditch, distance from POD, distance from interception of overland flow, distance from any source water inputs into the ditch. The ditch is just barely a scratch as it enters onto private property.
> (AR, Ex. 58, 000233, emphasis in original)
>
> I have in my notes that the ditch appears to hold water seasonally up to "Mud Bogger Flat/Haven", where the ditch is cut off by deep tire ruts. From that point, the ditch is discontinuous or at least indistinguishable in several places before "Frost Tank". . . .
> Beyond Dipping Corral, the ditch eventually leads out into a wide flat open area with trees here and there—and the ditch continues across this area for what I recall to be several hundred feet. There is no gradient here and ditch is very shallow. It appears impossible for water to "flow" in the ditch due to flat topography and dry, porous ground. . . . There was no depression in the ground to follow as we neared the private land but only what appeared to be raked or scraped ground so that vegetation and disturbed dirt made a barely visible line to follow but which would not direct or hold water as it was almost no different than the surrounding ground.
> (AR, Ex. 58 at 000233–24).

Based on the surveys and the photographic evidence, and taking the evidence of the record as a whole, there was a "rational connection between the facts found" and the conclusions that 1) the ditch died out before it reached private land, and 2) it had not been in continuous use.[3] *U.S. Army Corps of Eng'rs*, 384 F.3d at 1170. Even one Forest Service employee who later thought that the decision may be subject to reconsideration stated that based on the original survey, the conclusion that the ditch was abandoned was a "perfectly

---

[3] Plaintiffs' claim that the ditch begins on private land before flowing through federal land is irrelevant. The statute permits an easement when "the use served by the water system is not located solely on Federal lands." 43 U.S.C. § 1761(c)(1)(C). Plaintiffs do not claim that there are any points of use in the ditch before it passes into Federal land.

- 6 -

1  reasonable observation." (AR, Ex. 70 at 00295).

2  Once the application had been denied, Plaintiffs conducted extensive work to upgrade 3 the ditch, and submitted photographs demonstrating that, once upgraded, the ditch could 4 bring water to the private tank. (AR, Exs. 45–46). These photographs do not render the 5 Forest Service's initial evaluation incorrect. If anything, they demonstrate the degree to 6 which the ditch was in need of maintenance—Plaintiffs themselves acknowledge that the 7 maintenance conducted post-denial was more substantial than any they had recently 8 conducted. (Doc. 23 ¶ 19). The maintenance did not prove that the ditch carried water to 9 private lands prior to being re-dug, and Plaintiffs did not demonstrate that the ditch had been 10 in continuous use prior to the work.

11  Nevertheless, at least one Forest Service employee was convinced that the initial 12 decision was in error, and wrote that "[t]he only way for water to get to the tank would be 13 via the ditch." (AR, Ex. 65 at 000285). As a result, the Forest Service conducted further 14 investigation to determine whether the ditch in fact delivered water to private land. The 15 subsequent report found that the Johnson Place (Middle) Stockpond, which Plaintiffs claim 16 is filled by the ditch, could not be filled by it. The report states that "[i]f the POD location 17 is correct, the water would enter Mr. Hansen's private property from the southeast and would 18 not flow in the ditch which is on the northwest side of his property." (AR, Ex. 75 at 000310). 19 In his "Memorandum to Defendants' Cross-Motion Cross-Motion [*sic*] for Summary 20 Judgment," in which he otherwise contests facts in Defendants' Statement of Facts, he does 21 not challenge this later report, writing only "Comparative analysis?" in response to seven of 22 Defendants' statements. (Doc. 23 ¶¶ 20–27). The reliability of this report is underscored by 23 the fact that the Forest Service officer who originally favored granting the easement wrote 24 the July 26, 2010 letter confirming the agency's decision and noting that "all administrative 25 avenues associated with your application have been exhausted." (AR, Ex. 84).

26  Plaintiffs' unsupported challenges to the record are not persuasive. Hansen wrote, for 27 example, that Forest Service officers have been dishonest or have fabricated reports. (*See*, 28 *e.g.*, AR, Ex. 43 at 00186). Plaintiffs offer no support for this claim. Likewise, Plaintiffs

1 argue that mud produced by third parties driving all—terrain vehicles through the ditch
2 supports their claim that the ditch was in continuous use. In his May 28, 2009 letter, Hansen
3 wrote "[W]hat cause the mud bogger problem? The answer, WATER. Where did the water
4 come from? The answer, OUR DITCH. Why was it a constant yearly problem? The answer,
5 WE USED THE DITCH EVERY YEAR." (AR, Ex. 43 at 000187, emphasis in original).
6 Plaintiffs misunderstand the survey. The surveyors did not state that vehicle traffic over the
7 ditch demonstrated that the ditch was not in constant use; instead they noted that, because the
8 ditch is interrupted by vehicle traffic, water is impeded on its path towards private land, and
9 does not eventually reach private land. (AR, Ex. 58 at 000233–24).

10 Plaintiffs insist that they have used the ditch continuously for decades, and that it has
11 filled their tank. When reviewing agency decision making, however, "a court is not to
12 substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 42–43. Instead, the
13 Court's only role is to determine whether the record, taken as a whole, demonstrates that the
14 agency's decision was arbitrary, capricious, or in violation of law. In this case, the record
15 demonstrates that the Forest Service's decision was not arbitrary, capricious, or in violation
16 of law. Summary judgment will therefore be granted to Defendants.

## CONCLUSION

18 Prior to rejecting Plaintiffs' application for a ditch easement, Defendants conducted
19 a detailed survey and studied aerial photographs. As a result of these studies, Plaintiffs
20 concluded that the ditch had not been in continuous use and did not carry water onto private
21 land. Either finding would have required rejecting the application. After Plaintiffs conducted
22 maintenance on the ditch, Defendants again studied the area, and again concluded that the
23 ditch could not convey water to Plaintiffs' tank on private land. Defendants' conclusions are
24 supported by the record as a whole and their decisions were not arbitrary or capricious.

25 **IT IS THEREFORE ORDERED:**
26     1.    Plaintiffs' Motion for Summary Judgment (Doc. 19) is **denied**.
27     2.    Defendants' Motion for Summary Judgment (Doc. 20) is **granted**.
28     3.    The Clerk of Court is directed to **terminate this lawsuit**.

DATED this 17th day of January, 2012.

*A. Murray Snow*
G. Murray Snow
United States District Judge